UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------
In re                                        :        Chapter 11

A&M FLORIDA PROPERTIES II, LLC,              :        Case No. 09-15173 (AJG)

        Debtor.                        :
---------------------------------------------------------
GFI ACQUISITION, LLC, et al.

        Plaintiffs,

v.                                                    Adv. Pro. No. 09-01162 (AJG)

AMERICAN FEDERATED TITLE
CORPORATION,

        Defendant.
---------------------------------------------------------

**OPINION GRANTING, IN PART, AND DENYING, IN PART, DEFENDANT'S
MOTION FOR SANCTIONS**

APPEARANCES:

GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP
Attorneys for the Plaintiffs
1501 Broadway, 22nd Floor
New York, New York, 10036

        By:    Kevin J. Nash, Esq.
                  J. Ted Donovan, Esq.


ARNSTEIN & LEHR, LLP
Attorneys for Defendant
200 East Las Olas Blvd., Suite 1700
Fort Lauderdale, FL  33301

        By:    Franklin L. Zemel, Esq.
                  Stephen C. Hunt, Esq.


ARTHUR J. GONZALEZ
CHIEF UNITED STATES BANKRUPTCY JUDGE

On March 24, 2008, Plaintiffs, GFI Acquisition, LLC ("GFI") and related entities,[1] sued Defendant American Federated Title Corp. ("American Federated") in Florida state court for breach of a $41 million Purchase and Sale Agreement ("PSA") executed on July 3, 2007. *See* Compl. ¶ 68. GFI agreed to purchase four properties from the Defendant, and the parties set an outside closing date of February 4, 2008, for the deal. *Id*. ¶ 49. The Plaintiffs allege that American Federated refinanced three of the four properties. Compl. ¶¶ 18, 29, 35. They also claim that American Federated failed to disclose the existence of certain "lock-out" features contained in three loans which GFI would assume pursuant to the PSA.[2] *See Id*. ¶¶ 113-15.

American Federated, in its attempt to prove that GFI had knowledge of the lock-out features well in advance of signing the PSA, requested that GFI produce documents related to the transaction. 10/26/09 Decl. of Alaine S. Greenberg, former counsel to GFI, in Opp'n to Mot. for Sanctions ("Greenberg Decl.") ¶ 6. The Defendant was especially interested in obtaining email communications evidencing the fact that GFI had received copies of the promissory notes which contained the lock-out features. Although the Defendant was certain Plaintiffs should be in possession of such emails, they were not produced. There was one email in particular, sent by American Federated to GFI on April 25, 2007, which attached copies of the promissory notes. When GFI did not produce this email or many others that American Federated sent to GFI regarding the transaction, American Federated became suspicious of GFI's willingness to fulfill its discovery obligations in good faith. American Federated now brings a motion for

---

[1] The Plaintiffs include GFI Acquisition, LLC, A&M Florida Properties, LLC, A&M Florida Properties II, LLC, and A&M Florida Properties III, LLC. The opinion will refer to them collectively as the "Plaintiffs" or "GFI" interchangeably.

[2] The existence of the lock-out features meant that the loans could not be paid off at the time. Thus, GFI would have to assume them. *See* Compl. ¶ 35.

1

sanctions pursuant to Federal Rule of Civil Procedure 37(d) against the Plaintiffs.[3] For the reasons set forth below, the motion is GRANTED, in part, and DENIED, in part.

**BACKGROUND**

The complaint was served on the Defendant on April 2, 2008. Greenberg Decl. ¶ 5. On April 14, 2008, the Defendant served Plaintiffs with a request for production of documents. *Id*. ¶ 6. The Defendant also served a subpoena *duces tecum* upon Moshe Lehrfield of Greenberg Traurig, P.A., who was GFI's counsel regarding the purchase of the properties. *Id*. Lehrfield was deposed on June 3, 2008, and Greenberg Traurig produced responsive, non-privileged documents on that same date. *Id*. ¶ 12. GFI later responded to the April 14 request for production by claiming that all of its relevant documents had been produced in conjunction with Lehrfield's deposition. *Id*. ¶ 15. According to Ms. Greenberg, GFI's original attorney during the pending litigation and also of Greenberg Traurig, Lehrfield would have been copied on almost all of GFI's communications regarding the PSA, whether they included third parties or were only among GFI employees. *Id*. ¶ 9. She did note that GFI was instructed to look for documents that it did not copy Lehrfield on. *Id*. ¶ 15. American Federated's counsel was surprised that, considering the size of the transaction, GFI had not turned over any emails that were solely between GFI employees at this point.[4]

The litigation was transferred to this Court some time after an entity of GFI's parent company, A&M Florida Properties LLC, filed a voluntary petition under Chapter

---

[3] This motion may have been more appropriately brought under Federal Rule 37(c)(1), however the Court will not address this as Plaintiffs do not raise the issue.
[4] The parties refer to such emails as "internal" emails.

11 of Title 11 of the Bankruptcy Code in the Southern District of New York. *Id.* ¶ 16. At that point, GFI retained new counsel, Kevin Nash of Goldberg Weprin Finkel Goldstein LLP. *Id.* ¶ 17. According to Ms. Greenberg, other than assisting with legal analysis on certain issues, Greenberg Traurig has not been directly involved in the litigation since the transfer. *Id.* In August 2009, Nash ordered GFI to perform a "company-wide" search, purportedly to straighten out the discovery issues with the email production. *See* Ch. 11 Hr'g Tr. at 5, Oct. 14, 2009 ("Oct. 14, 2009 Tr."); 08/25/09 Dep. Tr. of Will Watkins ("Watkins Tr."), Ex. M to Mot. for Sanctions, at 17:8-23. This search was conducted under the direction of Deborah Garfinkle, GFI's Chief Technology Officer. *See* Oct. 14, 2009 Tr. at 11. According to the Defendant, it resulted in GFI turning over 346 previously unproduced, hard copy documents.

Although Nash called it a "company-wide" search, he was uninformed on the detailed workings of GFI's computer system and email retention policies. GFI's system distinguishes an employee's "live" email box from his or her "archive" and "deleted items" folders. 10/26/09 Decl. of Deborah Garfinkle Decl., in Opp'n to Mot. for Sanctions ("Garfinkle Decl.") ¶ 7. GFI employees have discretion to move emails from their live inboxes into archive folders and regularly do so. *Id.* ¶ 9. When an employee deletes an email from his or her mailbox, that message often goes into the deleted items folder. *Id.* ¶ 10. These messages, like those moved into archives, remain on GFI's system.[5] *Id.*

The results of the "company-wide" search were put onto CDs. Watkins Tr. at 17:8-14. Nash represented that he was in the process of having the contents of these CDs

---

[5] The deleted items folder resides in the live mailbox. Garfinkle Decl. ¶ 10. However, it is unclear to what extent the contents of the deleted items folders were recovered in the "company-wide" search.

3

transcribed onto paper so that he could review them and withhold any privileged communications. *Id*. In September 2009, counsel for American Federated attempted to contact Nash by email, seeking the results of the "company-wide" search to use in preparation for the deposition of William Watkins, a GFI employee. *See* Email from Stephen Hunt, counsel to American Federated, to Nash (9/14/09), Ex. C to Defendant's Reply to Opp'n to Mot. to Compel. Nash's colleague, Ted Donovan[6] responded with an email that had 28 emails attached to it. *See* Email from Donovan to Hunt (Sept. 14, 2009), Ex. C to Defendant's Reply to Opp'n to Mot. to Compel. Counsel for American Federated understood these 28 emails to encompass the full results of the "company-wide" search. Nash would later explain that these 28 emails were not the full results of the search, rather they were emails that involved Watkins and might be relevant for his upcoming deposition. Ch. 11 Hr'g Tr. at 10, Mar. 3, 2010. At this point, it is unclear whether or not this "company-wide" search included the archive and deleted items folders.[7]

The Defendant brought the lack of email production to the Court's attention in a pre-hearing conference on September 15, 2009. 9/24/2009 Stipulation and Order Regarding Electronic Discovery ("Stipulation"), Ex. A to Mot. to Compel the Prod. Of Approx. 10,000 Emails from the Plaintiffs' Counsel ("Mot. to Compel"). The parties thereafter agreed to jointly retain a certified computer forensic technician, Vestige Digital Investigations ("Vestige"), to search the GFI computer system. *See Id*. ¶ 1.

Vestige first searched GFI's system in September 2009. 10/12/2009 Decl. of Gregory Kelley, Chief Technology Officer of Vestige, Ex. D to Defendants' Emergency

---

[6] Donovan is also counsel to GFI and an attorney at Goldberg Weprin Finkel Goldstein.
[7] Nash explained that he did not have the complete results reviewed for privilege because a subsequent forensic search superseded his "company-wide" search. Ch. 11 Hr'g Tr. at 11, Mar. 3, 2010.

4

Request For Status Conference Regarding Spoliation of Evidence[8] ("Oct. 12, 2009 Kelly Decl.") ¶ 6. At this time neither Nash nor Vestige knew of the existence of the archive folders, thus Vestige's search was only of the live inboxes. *See* Ch. 11 Hr'g Tr. at 7, Oct. 28, 2009 ("Oct. 28, 2009 Tr."). After the forensic search produced very few emails from 2007, American Federated requested a status conference to discuss the possible spoliation of evidence on the part of GFI. *See* Emergency Request at 7. American Federated was in possession of emails involving GFI employees that GFI should have produced in response to American Federated's requests for document production. *See Id*. at 2. In particular, a March 22, 2007 email which Vestige should have been able to find on GFI's system, did not turn up in the search.[9] *See* Garfinkle Decl. ¶ 4. Counsel for American Federated contacted Vestige to discuss the missing email. Oct. 12, 2009 Kelley Decl. ¶ 8. Kelley concluded that the only possible explanation for the message's absence was that someone at GFI deleted it. *Id*. ¶ 10. American Federated, which had all along been suspicious of GFI's cooperation during the discovery process, believed that GFI had been purposely deleting certain emails from its system.

In an email exchange with Franklin Zemel, Defendant's counsel, Garfinkle responded to the suggestion that GFI was intentionally deleting emails. She informed him of the existence of the archive folders, and explained that GFI employees sometimes store emails in archives. Email from Garfinkle to Zemel (Oct. 12, 2009), Ex. A to Garfinkle Decl. Garfinkle indicated that GFI would have provided access to these folders all along if it had been asked to do so. Garfinkle Decl. ¶ 16. She did acknowledge that there were no items in the archives for Allen Gross, GFI's president, for the time period

---

[8] "Emergency Request"
[9] American Federated had possession of this email because it was a recipient of the email and thus had it in its own computer system.

5

of July 1, 2007, through the end of 2007, and that she was still searching for a separate archive file for this time period. *Id*. ¶ 12. American Federated continued to maintain that GFI had not produced internal emails that must have existed at one time. The absence of Gross' archive file was another red flag in the eyes of American Federated. It believed that Gross was the most important figure in the transaction, and the latter half of 2007 was the time period most critical to the litigation.

At an October 28, 2009 hearing, Nash explained that he had only recently learned the difference between archives and live inboxes. Oct. 28, 2009 Tr. at 7. Upon its own search of the archives, GFI found the missing March 22, 2007 email as well as others. *Id*. GFI believes the whole situation could have been avoided had counsel for American Federated simply included the archives in its search request. *Id*. at 8. American Federated, on the other hand, believes that GFI should have known to search the archives, especially when Garfinkle was aware of GFI employees' routine archiving of their emails. Both sides agreed that Vestige would return to GFI to conduct a second search, this time including the archives. *Id*. at 14.

The second Vestige search took place in November 2009. 1/29/2010 Decl. of Jeffrey Stafford, paralegal for counsel to American Federated, in support of Mot. to Compel ("Stafford Decl.") ¶ 27. The Stipulation, signed by both parties and entered September 24, 2009, distinguished the two types of searches Vestige would be conducting. The documents discovered in "field searches" would be immediately available for American Federated's viewing. *See* Stipulation ¶ 2. A field search only examines the "To", "From", "CC", and "BCC" fields of an email. Stafford Decl. ¶ 21. If a searched term is located in one of those fields, the email will be picked up as

6

responsive. Since a field search only attempts to locate emails sent or received by the agreed external parties mentioned in the Stipulation, it could not have produced any internal emails. *Id.* ¶ 37. Also, since an external party would always be included, none of the field search results would be privileged. *See Id.* Thus, no privilege review would be necessary, and Vestige could immediately make these emails available to Nash. The emails discovered in the "keyword" searches would be first sent to Nash so that he could withhold any privileged communications. *See* Stipulation ¶ 2. The keyword searches searched the body of an email in addition to the fields, and could possibly produce privileged communications. *See* Stafford Decl. ¶¶ 23-24. Therefore, Nash was to conduct a privilege review of the results of the keyword searches and authorize Vestige to release the non-privileged emails to American Federated. *Id.* ¶ 39.

In November, Vestige sent counsel for GFI two CDs containing 9,586 emails recovered from GFI's archives. 01/29/2010 Decl. of Gregory Kelley, in support of Mot. to Compel ¶ 9. These were the results of keyword searches, and thus had to be reviewed by Nash prior to being released to American Federated. As late as February 2010, American Federated's counsel had not received notification that any of these emails were available for viewing.[10] It appears that Nash did not understand the difference between his duties with respect to the results of the different types of searches. GFI's counsel was under the mistaken impression that all of the emails recovered from the second Vestige search had been available to American Federated since November 2009.[11] While the results of the field searches were available, the keyword search results were not.

---

[10] On page 19 of their Reply to Opp'n to Mot. to Compel, dated Feb. 17, 2010, Defendant states that they are "finally" in possession of the 10,000 emails.
[11] In their Opp'n to Mot. to Compel, Plaintiffs state that the emails sought by American Federated "have been available to Mr. Zemel since late November, 2009 through his own IT consultant, Vestige, and are not

7

Nash contends that American Federated's attorneys should have communicated the fact that they were unable to access the emails, and that he had no intention of hiding anything or delaying the discovery process. In any event, American Federated received access to the 9,500-plus emails[12] more than two months after the second forensic search. Included among these emails were the long sought-after internal messages. After multiple miscommunications and unnecessary delays, it appears that a complete production of documents has been provided by GFI.

## **DISCUSSION**

A. <u>Nature of Alleged Sanctionable Behavior</u>

As the email messages in question have been located following the second Vestige search, this is no longer a motion for sanctions for spoliation of evidence.[13] The Defendant now asks the Court to sanction the Plaintiffs and their counsel for intentionally obstructing the discovery process. The Defendant contends that it has incurred needless costs and frustration because of misunderstandings and delays caused by the Plaintiffs and their attorneys. American Federated, having now reviewed the content of some of the recently recovered internal messages, believes that GFI was intentionally preventing American Federated from gaining possession of these internal emails. American Federated asks the Court to dismiss the litigation. In the alternative, it seeks an adverse

---

being withheld by Plaintiff or its counsel." Plaintiffs' Opp'n to American Federated's Mot. to Compel Production ¶ 1.

[12] The actual number of emails turned over to American Federated was 9,586.

[13] Spoliation would involve "destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).

8

inference instruction, as well as payment of attorneys' fees and costs for its extra discovery efforts and the forensic work performed by Vestige.

B. Authority for Imposition of Sanctions

A court has the authority to sanction a party for spoliation and other discovery misconduct under its inherent power to manage its own affairs or under Rule 37 of the Federal Rules of Civil Procedure. *Phoenix Four, Inc. v. Strategic Resources Corp.*, No. 05 Civ. 4837(HB), 2006 WL 1409413, at *3 (S.D.N.Y. May 23, 2006). *See also Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002); *DLC Management Corp. v. Town of Hyde Park*, 163 F.3d 124, 135-36 (2d Cir. 1998); *Metro Opera Ass'n, Inc. v. Local 100 Hotel Employees & Rest. Employees Int'l Union*, 212 F.R.D. 178, 219 (S.D.N.Y. 2003) (citing *Nat'l Hockey League v. Metro Hockey Club, Inc.*, 427 U.S. 639, 640 (1976)). A court possesses wide discretion when imposing these sanctions. *Reilly v. Natwest Markets Group, Inc.*, 181 F.3d 253, 267 (2d Cir. 1999).

C. Possible Sanctions

1. Dismissal of Plaintiffs' Case with Prejudice

Despite the fact that spoliation is no longer at issue here, the Defendant argues that the appropriate sanction here would be dismissal of the Plaintiffs' case with prejudice. Even in cases of alleged spoliation, the grant of a terminating sanction is harsh and rare. *See Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988); *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1064 (2d Cir.

9

1979); *The Pension Committee of the University of Montreal Pension Plan, et al. v. Banc of America Securities, LLC*, No. 05 Civ. 9016(SAS), 2010 WL 184312, at *6 (S.D.N.Y. Jan. 15, 2010) ("[A] terminating sanction is justified in only the most egregious cases, such as where a party has engaged in perjury, tampering with evidence, or intentionally destroying evidence by burning, shredding, or wiping out computer hard drives."). The behavior of the spoliating party in a case warranting a terminating sanction is far more egregious than anything GFI or its attorneys may have done here. *See, e.g., National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 640, 96 S.Ct. 2778, 2779, 49 L.Ed.2d 747 (1976) (per curiam) (upholding dismissal where plaintiff failed to answer crucial interrogatories for seventeen months despite numerous time extensions and warnings from the court); *Embuscado v. DC Comics*, 347 Fed.Appx. 700, 701 (2d Cir. 2009) (upholding dismissal where plaintiff willfully and deliberately violated a series of court orders requiring the production of documents and had been warned by the magistrate judge of a possible dismissal); *Cine Forty-Second St. Theatre Corp.*, 602 F.2d 1062, 1068 (holding that dismissal was proper where party refused to comply with specific court orders to answer interrogatories for three years); *Gutman v. Klein*, No. 03 Civ. 1570(BMC), 2008 WL 5084182 at *2 (E.D.N.Y. Dec. 2, 2008) (granting default judgment where defendants intentionally destroyed evidence). While it is undoubtedly true that GFI and its counsel could have handled the discovery process better, there was no intentional destruction of evidence or failure to obey court orders. Dismissal would be unjustly harsh here, especially considering that American Federated eventually acquired the documents it sought all along. The Defendant's motion to dismiss with prejudice is denied.

2. Adverse Inference Instruction

In order to obtain an adverse inference instruction for the late production of evidence, the moving party must establish that: (i) the party having control over the evidence had an obligation to timely produce it; (ii) the party that did not timely produce the evidence acted with a "culpable state of mind"; and (iii) the tardily produced evidence is "relevant" to the party's claim or defense "such that a reasonable trier of fact could find that it would support that claim or defense." *Phoenix Four, Inc.*, 2006 WL 1409413, at *3; *Residential Funding Corp.*, 306 F.3d at 107; *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003). In this circuit, a showing of ordinary negligence demonstrates the culpability necessary to justify an adverse inference instruction. *Residential Funding Corp.*, 306 F.3d at 101; *Phoenix Four*, 2006 WL 1409413 at *4; *Zubulake*, 220 F.R.D. at 220; *Chan v. Triple 8 Palace, Inc.*, No. 03 Civ. 6048(GEL)(JCF), 2005 WL 1925579, at *6 (S.D.N.Y. Aug. 11, 2005).

The granting of an adverse inference instruction is a severe sanction. *Phoenix Four, Inc.*, 2006 WL 1409413, at *4; *Zubulake*, 220 F.R.D. at 219. Although it is arguable that the requisite elements are present in this case, the Court declines to engage in this analysis as such a penalty would be overly harsh for what has occurred here. *See Convolve, Inc. v. Compaq Computer Corp.*, 223 F.R.D. 162, 169-70 (S.D.N.Y. 2004) (holding that full disclosure of previously unproduced documents would suffice as a remedy even when party had erroneously stated that the documents did not exist); *Phoenix Four, Inc.*, 2006 WL 1409413, at *7 (holding that a sanction as severe as an adverse inference was not warranted where defendants came forward with the evidence,

11

even though it was after the close of discovery); *Williams v. Saint-Gobain Corp.*, No. 00 Civ. 502, 2002 WL 1477618, at *2 (W.D.N.Y. June 28, 2002) (holding that no basis for adverse inference instruction existed where defendant failed to produce emails until the eve of trial and there was no evidence of bad faith). In the end the Defendant was able to obtain the desired emails and there was no evidence of bad faith on the part of GFI's counsel.[14] Nash simply did not understand the technical depths to which electronic discovery can sometimes go.[15] The Court does not find any intent to block American Federated from gaining possession of the recently discovered messages. As the Court stated previously, the granting of an adverse inference instruction under the circumstances present would be overly harsh. Therefore, American Federated's request for an adverse inference instruction is denied.

3. Monetary Sanctions

In cases where discovery misconduct is found, a court retains the authority to impose monetary sanctions when it declines to impose a harsher sanction. *See Phoenix Four, Inc.*, 2006 WL 1409413, at *9. While the delays in discovery were not caused by any intentional behavior, GFI's counsel did not fulfill its obligation to find all sources of relevant documents in a timely manner. Counsel has an obligation to not just request documents of his client, but to search for sources of information. *Id*. at *5. Counsel must communicate with the client, identify all sources of relevant information, and "become fully familiar with [the] client's document retention policies, as well as [the] client's data

---

[14] The Court believes Nash ordered the "company-wide" search in good faith and cooperated with the Vestige searches. The parties split the cost of the Vestige searches. Nash claims that his part of the cost was $12,000. Ch. 11 Hr'g Tr. 6, Mar. 3, 2010.
[15] The degree of GFI's negligence, if any, is unclear from the record. The Court will make a determination on this subject at a later hearing.

12

retention architecture." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004).[16] Nash failed in his obligation to locate and produce all relevant documents in a timely manner. A diligent effort would have involved some sort of dialogue with Garfinkle and any key figures at GFI to gain a better understanding of GFI's computer system. *See Phoenix Four, Inc.*, 2006 WL 1409413, at *5 (stating that counsel's effort to discover all sources of relevant information "would involve communicating with information technology personnel and the key players in the litigation to understand how electronic information is stored."). Had he posed the proper questions in these dialogues, Nash would have gained a more nuanced understanding of how GFI employees stored emails much earlier in the discovery process.[17] Assuming GFI was operating in good faith, it is almost certain that the archive folders would have been mentioned.

Had Nash fulfilled his obligation to familiarize himself with GFI's policies earlier, the forensic searches and subsequent motions would have been unnecessary. The Court finds that monetary sanctions are appropriate here and orders GFI and its counsel to reimburse American Federated its half of the cost of the forensic searches.[18] GFI and its counsel are also ordered to reimburse American Federated for the costs associated with bringing the motion for sanctions and the motion to compel. The facts presented at this time do not permit the Court to determine an allocation of the fees and costs among GFI

---

[16] Also called "Zubulake V."

[17] Nash said that at the time the Vestige search was first tailored, he was not familiar with archives. Ch. 11 Hr'g Tr. 7, Oct. 28, 2009.

[18] It appears from the record that Greenberg Traurig also did not locate all sources of relevant information as the archives were not searched prior to removal of the action to this Court. However, after reviewing the Florida Rules of Civil Procedure as well as Florida case law, the Court sees nothing that imposes a duty similar to the duty Nash must comply with under the Federal Rules and applicable case law. The Defendant cites *Watson v. Peskoe* for the proposition that a court can impose sanctions for failure to produce documents. 407 So.2d 954 (Fla.3d DCA 1981). However, that case involves a party's willful failure to comply with a court's discovery order. Therefore, it does not provide support for the relief sought by Defendant.

and its attorneys. Therefore, a hearing will be scheduled to determine the amount of attorneys' fees and costs to be reimbursed. The Court will then determine the percentage of that amount GFI and its counsel will be responsible for paying respectively.

## **CONCLUSION**

While the Court does find that sanctionable conduct occurred, the Defendant's motions for the severe sanctions of dismissal, or, in the alternative, an adverse inference instruction, are denied. The Defendant's motion for monetary sanctions is granted as set forth above.

American Federated is to settle an order consistent with this opinion. Prior to settlement of the prepared order, counsel for American Federated is to contact chambers to schedule further proceedings in this matter regarding the amount and allocation of the monetary sanctions.

April 7, 2010

                                 **s/Arthur J. Gonzalez**
                                 CHIEF UNITED STATES BANKRUPCY JUDGE