UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| A&M FLORIDA PROPERTIES II, LLC, | : | Case No.: 08-15173 (AJG) |
| | : | |
| Debtor. | : | |

---------------------------------------------------------------

| | | |
|---|---|---|
| GFI ACQUISITION, LLC, et al. | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Adv. Pro. 09-01162 (AJG) |
| | : | |
| AMERICAN FEDERATED TITLE | : | |
| CORPORATION, | : | |
| | : | |
| Defendant. | : | |

---------------------------------------------------------------

**OPINION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

APPEARANCES:

GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP
Attorneys for the Plaintiffs
1501 Broadway, 22nd Floor
New York, New York  10036

    By: Kevin J. Nash, Esq.
       J. Ted Donovan, Esq.

ARNSTEIN & LEHR, LLP
Attorneys for Defendant
200 East Las Olas Blvd., Suite 1700
Fort Lauderdale, FL  33301

    By: Franklin L. Zemel, Esq.

McLAUGHLIN & STERN
Attorneys for Defendant
260 Madison Ave.
New York, NY  10016

    By: Paul H. Silverman, Esq.

ARTHUR J. GONZALEZ
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Before this Court is the Motion for Summary Judgment (the "Motion") of

Defendant, American Federated Title Corporation ("AFTC").  The Motion was filed on

April 21, 2010, pursuant to Fed. R. Civ. P. 56, as incorporated into bankruptcy practice

by Fed. R. Bankr. P. 7056.  The Defendant avers that no genuine issues of material fact

exist for any of the remaining counts of the complaint.  The Plaintiffs, GFI Acquisition

LLC ("GFI"), filed their opposition (the "Opposition") to the Motion on May 14, 2010.

The Defendant filed its reply (the "Reply") on May 20, 2010.  A hearing was held on

May 27, 2010.  For the reasons outlined below, the motion is GRANTED in its entirety.

## Background

GFI is a New York-based real estate firm that is involved in the development and

management of properties, as well as mortgage banking and insurance services.  GFI has

approximately 1,000 employees located in 85 offices nationwide.  Allen Gross ("Gross")

serves as the President, Chief Executive Officer and sole owner of GFI.

AFTC is an entity of the Cornfeld Group, a Florida-based real estate investment

firm.  AFTC acts as a trustee for several of the Cornfeld Group's properties.  Robert

Cornfeld ("Cornfeld") is the President and sole shareholder of AFTC.

On March 24, 2008, GFI and related entities,[1] filed a complaint in Florida state

court against AFTC in connection with the Purchase and Sale Agreement ("PSA")

entered into by the parties, under which AFTC agreed to sell four of its properties to

A&M Florida Properties I, II and III, entities of GFI.  The parties never completed the

transaction, and in its complaint GFI alleges that AFTC breached the agreement and

committed fraud in the inducement by not disclosing the existence of "lockout"

---

[1] The Plaintiffs include GFI Acquisition, LLC, A&M Florida Properties, LLC, A&M Florida Properties II, LLC, and A&M Florida Properties III, LLC.  The opinion will refer to them collectively as the "Plaintiffs" or "GFI," interchangeably.

provisions that would restrict GFI's ability to immediately pay off the loans encumbering the properties involved in the transaction.[2]  Under Section 11 of the PSA, GFI was given the option to either assume the various loans or to "direct the Seller to pay off the loans at or prior to the closing date and increase the purchase price by the amount of the defeasance costs."  *Id. ¶47.*  The litigation was transferred to this Court some time after A&M Florida Properties, LLC filed a voluntary petition under Chapter 11 of Title 11 of the Bankruptcy Code in the Southern District of New York.

Under the terms of the PSA executed by the parties on July 3, 2007, AFTC agreed to sell four properties to GFI for a total purchase price of $41,457,647.46 with a deposit of $2,600,000.[3]  *See* Comp. ¶43, 45, 46.  At the time that the PSA was executed, GFI held a long-term lease agreement with AFTC on all four of the properties.  *Id. ¶37.*  As late as December 2007, the parties engaged in discussions about the possibility of modifying the sale agreement to include only two or three of the properties.[4]  *Id. ¶*74; *see* Answer ¶75. However, the parties never executed an Amendment to the PSA that would render such a modification binding.  The closing date for the sale stipulated in the PSA was February 4, 2008, but on December 27, 2007, the parties signed an Amendment to the PSA which extended the closing date by ten days.  *Id. ¶60.*  GFI, however, did not deliver the funds stipulated under the PSA on the extended closing date and the sale was never completed.

---

[2] The loan term figures as applied to each property are as follows: (i) $19,369,000.00 as to the Carib Villas Property, and (ii) three loans in the amount of $3,222,496.54, $158,377.77 and $500,000.00, as to the Cutlerwood Property, and (iii) $6,800,000.00 as to the Palm Gardens Property, and $4,640,000.00 as to the Shady Oaks Property.  *See* Comp. ¶¶ 18, 23, 29, 35.  The loans encumbering the Carib Villas Property and the Palm Gardens Property contained a lockout period in which the loan could not be pre-paid and thereafter payoff of the loan was subject to a pre-payment penalty.  *See* Comp. ¶¶ 18, 29.

[3] In Schedule A of the PSA, the parties allocated the purchase price as follows:  "(i) $13,640,000.00 as to the Carib Villas Property, and (ii) $8,044,247.46 as to the Cutlerwood Apartments Property (iii) $10,940,000 as to the Palm Gardens Property; (iv) $8,833,400.00 as to the Shady Oaks Property."

[4] This modified agreement would be limited to the sale of the Carib Villas and Cutlerwood Properties.  *See* Comp. ¶ 76.

In its complaint, GFI alleges that AFTC prevented the closing of the sale by breaching the PSA and committing fraud in the inducement by providing misleading information regarding the terms of certain loans encumbering the properties included in the transaction. *Id.* ¶102, 115. The complaint includes four claims under which GFI is seeking: (1) specific performance requiring AFTC to perform its obligations under the PSA, along with ancillary damages for breach of contract and Plaintiffs' attorneys' fees, (2) judgment that AFTC breached the PSA by failing to provide notice to GFI that it was in default of the agreement, failing to provide GFI with proposed closing documents and breach of the purportedly modified agreement to close on two of the properties, with award of damages that includes the return of the $2,600,000 deposit, (3) declaration of rights relating to GFI's preexisting lease agreement with AFTC, as amended by the PSA, (4) judgment that AFTC committed fraud in the inducement by failing to disclose and misrepresenting terms of the loans relating to reserve requirements, repair obligations and lockout provisions with award of damages. *Id.* ¶¶ 88, 95, 100, 101, 104, 110, 113, 115, 121.

The Plaintiffs' claims relating to specific performance and declaration of rights have been abandoned. The Defendant moves for Summary Judgment on the two remaining claims relating to breach of contract and fraud in the inducement.

## Jurisdiction

The Court has subject matter jurisdiction over this proceeding pursuant to sections 1334 and 157(b) of title 28 of the United States Code, under the July 10, 1984 "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.), and under the Order Amending

Final Order of Transfer, which transferred this case on April 20, 2009 from the United

States District Court for the Southern District of Florida to the United States District

Court for the Southern District of New York.

### Discussion

#### A. *Summary Judgment Standard*

Fed. R. Civ. P. 56(c) incorporated into bankruptcy practice by Fed. R. Bankr. P.

7056 provides that summary judgment shall be rendered "if the pleadings, depositions,

answers to interrogatories, and admissions of file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law."  Rule 56(c) specifies that to preclude summary

judgment, the fact in dispute must be material.  Substantive law determines the facts that

are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986).  If a fact is material, it is then necessary to see if the dispute about

that material fact is genuine, "that is, if the evidence is such that a reasonable jury could

return a verdict for the non-moving party." *Id.* at 248.  If the fact may be reasonably

resolved in favor of either party, then there is a genuine factual issue that may only be

resolved by the trier of facts and summary judgment will be denied.  *Id.* at 250.  If,

however, the evidence "is so one-sided that one party must prevail as a matter of law,"

then summary judgment will be granted.  *Id*. at 252.  On considering a motion for

summary judgment, the evidence is viewed in the light most favorable to the non-moving

party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-159, 90 S.Ct. 1598, 1609, 26

L.Ed.2d 142 (1970).

After the non-moving party to the summary judgment motion has been afforded a

sufficient time for discovery, summary judgment must be entered against it where it fails

to make a showing sufficient to establish the existence of an element essential to its case

and on which it has the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317,

322 106 S.Ct. 2548, 2552 (1986). It is said that there is no genuine issue concerning any

material fact because "a complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial." 477 U.S. at 323,

106 S.Ct. at 2552. In this manner, the summary judgment standard is similar to the

directed verdict standard under Fed. R. Civ. P. 50(a). *Id.*

The summary judgment standard is interpreted in a way to support its primary

goal of "dispos[ing] of factually unsupported claims or defenses." *Celotex*, 477 U.S. at

323-24, 106 S.Ct. at 2553. The summary judgment movant meets its burden by

"'showing . . . that there is an absence of evidence to support the nonmoving party's

case." 477 U.S. at 325, 106 S.Ct. at 2554. Application of the summary judgment

procedure is not a disfavored procedural shortcut, but an integral part of the Federal

Rules where there are no triable factual issues. *Celotex*, 477 U.S. at 327, 106 S.Ct. at

2555.

## B.  *Breach of Contract*

In the complaint, GFI makes three arguments in an attempt to demonstrate that

AFTC committed breach of contract. First, it argues that AFTC breached a modified

agreement, under which the parties agreed to close on two of the four properties listed in

the PSA. Second, it asserts that AFTC breached the terms of the PSA by failing to

provide the Sellers' proposed closing documents. Finally, GFI also claims that AFTC

breached the PSA by failing to provide GFI with any notice of default along with the required "cure" period.  The Court will address each of Plaintiffs' arguments in turn.

1.  *Modified Agreement*

In support of its claim that AFTC breached a modified agreement entered into by the parties, GFI argues that such agreement was established both orally and through a written contract.  As evidence of a written contract, GFI points to a letter sent by Cornfeld, President of AFTC, to Moshe Lehrfield of Greenberg Traurig, who represented GFI in the transaction.  *See* Opposition at p. 11.  In the letter, Cornfeld is venting his frustration over what he perceives as the various instances in which GFI has unilaterally altered the terms of the transaction.  Opposition, Exhibit 4.

GFI places a great deal of emphasis on the fact that in the letter Cornfeld acknowledges that at a point in time subsequent to executing the PSA, he had verbally agreed to sell two of the properties.  While GFI acknowledges Cornfeld's mentioning of the fact that he never agreed to GFI's version of the modified agreement, GFI nevertheless contends that this in no way detracts from the complete oral agreement to which the letter attests.

In the event that the letter is not considered to be a valid written agreement that would modify the PSA, GFI argues that this letter is nonetheless sufficient in demonstrating that there was an oral agreement that was both "accepted and acted upon," which is the standard that must be met in order for an oral agreement to modify a pre-existing written contract.  *Arvilla Motel Inc. v. Shriver*, 889 So.2d 887, 891 (Fla. 2nd DCA 2004).  GFI claims that AFTC's refusal to close the sale involving two of the properties constituted a breach.

The Defendant argues that in fact there was no modified agreement between the parties. First, AFTC challenges the notion that Cornfeld's letter can be deemed a valid written agreement, as it does not satisfy the Fla. Stat. Ann. §689.01 (West 2008), which requires that an agreement for sale of a property be (1) signed by the seller, and (2) in the presence of two subscribing witnesses. AFTC argues that Cornfeld's letter did not meet either of these criteria. In addition, AFTC challenges the Plaintiffs' view that the alleged oral modification was both "accepted and acted" upon in this case. AFTC argues that there was clearly not an accepted agreement, since the letter indicates that there was a significant lack of agreement between the parties with respect to critical terms of the proposed modified agreement, such as the whether the Buyer would receive a discount of $2,000,000 even though it would only be purchasing two of the properties.[5]

Section 22 of the PSA stipulates that any alterations to the agreement must be made in writing. However, under Florida law an oral modification of a written agreement is possible even when the written contract contains a provision prohibiting the alteration except in writing, as long as the oral agreement has been "accepted and acted upon" by the parties. *Arvilla Motel*, 889 So.2d at 891. In making such a determination, a court must evaluate whether the oral agreement "has been accepted and acted upon by the parties in a manner that would work a fraud on either party to refuse to enforce it." *W.W. Contracting, Inc. v. Harrison*, 779 So.2d 528 (Fla. 2nd DCA 2000).

In applying the standard to the facts of the given case it is clear that regardless of whether or not an oral agreement existed between the parties, it did not rise to the level of

---

[5] In the letter, Cornfeld contends that he agreed to provide the $2,000,000 discount to the sale price on the strict condition that the terms of the deal would be "strictly for all cash, for all four properties." He writes that he expressed clearly to GFI that the discount would not be offered if the sale did not include these terms. *See* Opposition, Exhibit 4.

an agreement that was both accepted and acted upon. As was discussed above, the letter between Cornfeld and the Plaintiffs' attorney indicates that there was significant uncertainty with respect to a critical term of the sale and therefore it is clear that there was no "meeting of the minds" established by the parties. *See Business Specialists Inc., v Land and Sea Petrolem Inc.*, 25 So.3d 693, 694 (Fla. 4th DCA 2010) (holding that a meeting of the minds of the parties on all essential elements is required in order to have an enforceable contract). Since GFI does not present any evidence that the alleged oral agreement was accepted and acted upon, it cannot be said that "it would work a fraud on either party to refuse to enforce" this incomplete agreement. *W.W. Contracting*, 779 So.2d at 528.

While Section 22 of the PSA states that the written contract embodies the entire agreement between the parties, it stipulates that the agreement can be modified through a signed document "by the party against whom enforcement of such change would be sought." Nevertheless, the aforementioned letter written on behalf of AFTC and delivered to Plaintiffs' counsel cannot be considered a valid written agreement modifying the PSA, as it clearly does not meet the criteria for a written contract under the Statute of Frauds as stated under Fla. Stat. Ann. §689.01 (West 2008), which as the Defendant correctly notes, requires that an agreement for sale of a property be (1) signed by the seller, and (2) in the presence of two subscribing witnesses. There has been no evidence presented that either of these criteria was met in Cornfeld's letter.[6]

---

[6] The letter from Cornfeld to Moshe Lehrfield, counsel for the Plaintiff, contains no signature. *See* Opposition, Exhibit 4.

2. *Seller's Failure to Provide Proposed Closing Documents*

GFI asserts that AFTC's failure to provide GFI with proposed closing documents amounted to a breach of the PSA, as it interprets Section 14 as requiring the Seller to prepare and deliver these documents. AFTC challenges this argument by asserting that GFI grossly misinterprets Section 14 of the PSA. Section 14 of the PSA stipulates that the closing documents "shall be prepared by **Purchaser** and reasonably acceptable to seller." AFTC argues that in light of this stipulation it could not be considered to have breached the PSA by not providing the Plaintiffs with the closing documents, as it was solely GFI's responsibility to provide such documents.

While GFI argues that under Section 14 of the PSA the Seller was obligated to provide proposed closing documents, it is clear that the PSA designated the Buyer, GFI, with this responsibility. As the Defendant argues in the Motion at p. 18, Section 14 states unambiguously that the closing documents "shall be prepared by **Purchaser** and reasonably acceptable to seller." Therefore, GFI's claim that AFTC breached the PSA by not providing the proposed closing documents is completely untenable.

3. *AFTC's Failure to Provide Notice of Default*

GFI alleges that AFTC breached the PSA by not providing GFI with notice of default. In the complaint, GFI does not specify the act of default which would have necessitated such notice from AFTC, and in fact GFI states that it was not in default. Section 9 of the PSA stipulates that prior to declaring default, the non-defaulting party must provide notice of default to the other party, along with a five-day "cure" period in which the default can be remedied. GFI argues that since it was not provided with any notice of default, AFTC did not have any grounds for terminating the PSA.

Aside from arguing that AFTC was required to provide it with notice of default, GFI invokes an alternative argument that the closing date set forth in the First Amendment was not valid. In the Opposition at pp. 28-30, GFI contends that AFTC waived the time of the essence clause for the closing date through orally modifying the sale agreement.[7] GFI argues that AFTC caused the delay in the performance of the contract by modifying the agreement from four properties to two and refusing to execute a proposed Second Amendment that would have extended the closing date. GFI relies on *Coppola Enterprises, Inc. v. Alfone*, which held that a time of the essence clause could be waived when a party has caused a delay in the performance of the contract. 531 So.2d 334 (Fla. 1988).

AFTC argues that GFI has again misinterpreted the terms of the PSA, as Section 9 of the PSA states that the seller is not required to provide the buyer with notice of its default for its failure to provide the seller with the agreed upon funds at the closing date. AFTC argues that as a result, it is possible for GFI to have defaulted on the terms of the contract without AFTC being required to provide notice for such a default.

Determination of the Plaintiffs' claim that the Defendant breached Section 9 of the PSA as a result of its failure to provide the Plaintiffs with notice of default depends solely on interpretation of the terms of the PSA. A complete reading of Section 9 demonstrates that the Defendant's failure to provide GFI with notice of default does not lead to the conclusion, as GFI asserts, that the Defendant would have no grounds for terminating the PSA. While Section 9 stipulates that the non-defaulting party is required to provide notice along with a five-day cure period prior to declaring default, it explicitly states that such notice is **not** required for a default arising out of the Buyer's failure "to

---

[7] Section 21(f) of the PSA states: "Time shall be of the essence for each and every provision hereof."

deliver on the Closing Date the monies and documents required to be delivered by the Purchaser under this Agreement."  Since it is undisputed that GFI did not provide the stipulated funds on the closing date, AFTC would have grounds for terminating the contract without notice, as Section 9 states that the PSA can be terminated as a result of "the failure or refusal of purchaser to close this transaction."

In addition, GFI's argument that the Defendant waived the time of the essence clause and as a result had no right to terminate the PSA is not supported by the record or by the law.  First, much of this argument is predicated on GFI's assumption that there was a modified agreement, which, as discussed above, there was not.  GFI also contends that by refusing to sign a Second Amendment to the PSA, GFI had waived the time of the essence clause for the closing date.  In asserting this claim, GFI correctly notes that a time of the essence clause can be waived when a party has caused a delay in the performance of the contract.  *Coppola Enterprises*, 531 So.2d at 334 (Fla. 1988). However, aside from its faulty allegation that the terms of the sale had been effectively modified by the parties, GFI makes no demonstration that AFTC prevented the parties from following the closing date stipulated in the First Amendment.  Therefore, the time of the essence clause included in Section 21(f) of the PSA was not waived, as AFTC had the right to refuse to extend the closing date by not signing the Second Amendment. *Schopler*, 889 So.2d at 891 (finding that when there is an express time of the essence clause in a contract, Seller has right to refuse request for extension of the closing date); *accord Seabreeze Restaurant Inc. v. Paumgardhen,* 639 So.2d 69, 70 (Fla. 2nd DCA 1994).  Moreover, GFI's argument that in refusing to sign the Second Amendment, AFTC had an obligation to provide notice to GFI that it was in default is without merit.

As discussed above, Section 9 provides that there is no requirement to provide notice to the buyer of its failure to provide the stipulated funds at the closing date.

### C.  *GFI's Unpleaded Breach of Contract Claims*

In the Opposition, the Plaintiffs state three additional claims against AFTC for breach of the PSA, none of which are mentioned in the Plaintiffs' complaint.  First, GFI claims that the Defendant breached the PSA through its failure to cooperate during the loan assumption process.  Second, GFI claims that the assumption of GFI's loans became more difficult as a result of the lenders changing the loan terms prior to the closing date. GFI does not explicitly state what legal argument there is for this claim, but it will be addressed under the breach of contract section.  GFI also alleges that AFTC's failure to obtain the required approval of sale from the Housing Assistance Payment program ("HAP") constituted a violation of the PSA.

*Standard for Unamended Pleadings*

Since the claims mentioned in the Opposition are not stated in the complaint, it is necessary to first evaluate whether the Court should recognize these claims at all.  Fed. R. Civ. P. 15(a) incorporated into bankruptcy practice by Fed. R. Bankr. P. 7015 provides that a "party may amend its pleading once 21 days after serving it, or if the pleading is one to which a responsive pleading is required then 21 days after service of a responsive pleading."  It states further that when a party has not amended within 21 days after service then "in all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires." *Id.*

13

In the given case, GFI did not amend its complaint within 21 days of service and has not requested written consent from the opposing party or from the Court to make such amendments. The Court would therefore not be required to recognize the additional breach of contract claims that are stated in the record for the first time in the Opposition. Nevertheless, for the sake of completeness the Court will address these additional claims.

1. *Failure to Aid in Loan Assumption Process*

With respect to the first claim, GFI argues that AFTC breached the PSA by obstructing GFI's ability to assume the loans. GFI supports this claim by pointing to evidence from statements made by Cornfeld, President of AFTC, in his deposition. Cornfeld Dep. at pp. 272-274. GFI specifically emphasizes the fact that when asked about his compliance with various requests from GFI to provide documentation for the loan assumption application, Cornfeld does not recall whether or not he responded to any of these requests. *Id.* Instead he states in response to questioning about delivering requested documents that "any of these that they requested, if we had them and felt they were proper, they got." *Id.* at p. 308. GFI claims that in fact Cornfeld did not comply with the various requests for documents, and as a result the loan assumption process was obstructed. GFI argues that even if the PSA contained no provision obligating the Seller to assist in the loan assumption process, AFTC nevertheless violated its duty to perform in good faith, as supported by the court's ruling in *County of Berevard v. Miorealli Eng'g Inc.*, 703 So.2d 1049, 1050-51 (Fla. 1997) (noting that "[v]irtually every contract contains implied covenants and conditions.").

The Defendant, in the Reply, challenges GFI's claim regarding AFTC's obstruction of the assumption of the loan on three grounds. First, it argues that it did not

obstruct the loan assumption process and that there is no issue of material fact with

respect to this issue.  The Defendant notes that GFI's reliance on Cornfeld's statements in

his deposition do not demonstrate any lack of cooperation, as Cornfeld simply states that

he does not recall whether he provided the requested documents, but he affirms that in

general AFTC complied with any application request made by the Plaintiffs which was

deemed as being appropriate.  Cornfeld Dep. at p. 308.  AFTC further argues that

regardless of whether there is evidence demonstrating that it did not cooperate in the loan

assumption process, GFI would have been required under Section 9 of the PSA to

provide notice of default.  However, since no such notice was provided, there can be no

claim of breach against AFTC.

In response to GFI's claim that AFTC had a good faith obligation to cooperate

during the loan assumption process even if no such obligation existed under the PSA,

AFTC argues that under Florida law there is no implied good faith when it does not

attach to an express term in the contract.  *See Snow v. Ruden, McClosky, Smith, Schuster*

*Russell P.A.*, 896 So.2d (Fla. Dist. Ct. App. 2005) (holding under Florida law that an

implied covenant of good faith does not serve as an independent contractual provision,

but rather it attaches to the "performance of a specific or express contractual provision").

Since there was no express term in the PSA requiring AFTC to assist GFI in the loan

assumption process, AFTC contends that there would be no implied good faith covenant.

In considering GFI's claim that AFTC breached the PSA by obstructing the loan

assumption process, it is necessary to evaluate:  (1) whether the express terms of the PSA

obligate GFI to provide notice of default regarding its refusal to cooperate during the loan

assumption process, and (2) whether the PSA imposed an implied covenant of good faith

that obligates AFTC to cooperate in the loan assumption process.  After evaluating these issues, it is apparent that any failure by AFTC to assist GFI in the loan assumption process would not constitute a breach of contract.

Regardless of whether or not there is a material issue of fact as to whether AFTC obstructed the loan assumption process, GFI would not have a valid breach of contract claim against AFTC.  First, there is no express term in the PSA that requires AFTC to assist GFI in its efforts to assume the loans.  GFI does not point to any provision of this kind, but rather it simply argues that even if there was no such provision, AFTC would still have an implied covenant of good faith.  Opposition at p. 22.  Moreover, even if there would be an explicit term in the PSA requiring such cooperation, GFI's claim would still be undercut by the fact that Section 9 of the PSA requires that prior to declaring default, a notice of default must be delivered by the non-defaulting party along with the allowance of a five-day cure period.  There is no indication in the record that GFI ever provided such notice.

With respect to GFI's argument that AFTC's failure to cooperate during the loan assumption process constituted a breach of its duty to perform in good faith, it is established under Florida law that in this instance there would be no implied covenant of good faith.  While GFI attempts to demonstrate support for its view through citing the court's view in *County of Berevard v. Miorealli Eng'g Inc.* that "every contract includes an implied covenant that the parties will perform in good faith," it is clear that the court there is not addressing the question of whether an implied covenant of good faith applies to terms that are not expressed in the contract.  703 So.2d 1049, 1050-51 (Fla. 1997).

Moreover, that court is discussing the implied covenant of good faith as it applies specifically to the area of construction contract law. *Id.*

In fact, under Florida law there is only an implied covenant of good faith when an express term of the contract has been breached. *See Snow v. Ruden, McClosky, Smith, Schuster Russell P.A.*, 896 So.2d (Fla. Dist. Ct. App. 2005); *see also Centurion Air Cargo v. UPS Co.,* 420 F. 3d 1146, 1151 (11th Cir. 2005) (noting that a "claim for a breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law in the absence of a breach of an express term of a contract."). Since there is no express term in the PSA obligating the Seller to assist in the loan assumption process, an implied covenant of good faith could not be imposed on AFTC.

2. *Modification of Loan Terms*

Plaintiffs make an additional claim of breach against the Defendant by arguing that the assumption of the loans became more difficult as a result of the lenders modifying certain terms. While GFI mentions the modified terms imposed by the lenders in its complaint under the factual background section, there is no mention of this issue in the actual breach of contract section of the complaint. *See* Comp. ¶55. Furthermore, in the Opposition at p. 23, GFI devotes a section to discussing the impact that the lenders modification had on the assumption process, but it does not appear to state clearly on what grounds this would result in a valid claim of breach against the Defendant.

AFTC, in the Reply at pp. 14-15, argues that there are absolutely no legal grounds for claiming that it breached the PSA due to the loan terms imposed on GFI by the lenders. Moreover, the Defendant points to the fact that Gross, President of GFI,

expressly stated that he was still intent on closing the transaction even after the lenders

demanded that he personally guarantee the loan. *Id.*

Changes made to the loan provisions by the lenders would not constitute a breach

of the PSA by AFTC, as there is no provision in the PSA that imposes liability on AFTC

for modifications made by the lenders.  It is important to note that GFI does not even

bother to explain what the basis or grounds for such a claim would be.  In fact, Gross

explicitly stated that despite knowledge of the modifications to the loan terms, GFI was

still intent on closing the transaction.  Cornfeld Dep. at p. 15.

3.  *HAP Approval*

GFI, in the Opposition at pp. 24-28, alleges that AFTC breached the PSA by not

obtaining approval of sale from the Miami Dade Housing Assistance Payment program

("HAP") prior to closing.  HAP is a government program that provides subsidies to

tenants for rent payments.  Beginning in 1989, AFTC had an agreement with HAP, under

which the program provided subsidies to tenants residing in AFTC's Cutlerwood

property.  The overwhelming majority of tenants residing in Cutlerwood at the time that

the PSA was executed participated in HAP.[8]

It is undisputed in the record that AFTC did not obtain and deliver HAP approval

for the sale prior to the closing date, which GFI argues was in violation of both the

Defendant's agreement with HAP, as well as the PSA.  Section 1.18 of the HAP

agreement contains a restriction prohibiting "any sale, assignment or conveyance or

transfer in any other form, of this contract or any part of it or any of the Owner's interest

in the Contract Units or this Contract, without the prior written consent of the Public

---

[8] Approximately 155 of the 170 tenants living in Cutlerwood at the time that the PSA was executed were
provided through HAP.  Cornfeld Dep. at p. 78.

Housing Agency (PHA)." GFI argues that AFTC's failure to obtain the requisite sale approval from HAP also violated a number of provisions in the PSA. First, Section 14(h) of the PSA requires the Seller to provide "evidence of . . . its authority to sell or convey the property." Additionally, in Section 8(a), which includes the Seller's representations, AFTC affirmed that "No consent of any other person or entity to such . . . performance is required to render this document a valid and binding instrument enforceable against the Seller in accordance with its terms." Based on these two provisions, GFI claims that AFTC's failure to receive HAP approval of the sale violated its obligation to obtain and deliver all necessary third party consents for the transaction.

AFTC, in the Reply at p. 15, challenges GFI's claim that the failure to obtain HAP approval prior to the closing date constituted a violation of the PSA. AFTC argues that even if the failure to receive HAP approval were valid grounds for breach, GFI would have an obligation under Section 9 to provide notice of default with a period to "cure" the violation. AFTC asserts that since GFI did not provide such notice, AFTC cannot be considered to have breached the PSA. AFTC emphasizes that notice would have been particularly effective in remedying the issue, since GFI was already in privity with HAP as a result of the existing lease agreement between GFI and AFTC, and therefore obtaining HAP approval would have simply been a ministerial process.

Additionally, AFTC attempts to demonstrate that in fact the PSA did not require the delivery of HAP approval, since HAP approval was not necessary in order for the PSA to be considered a "binding instrument enforceable against the Seller," as required under Section 8(a). And while AFTC acknowledges that Section 14(h) requires the Seller to provide evidence of Seller's "authority to sell and convey the property," it argues that

19

this condition must be read in the context of Section 8(a), in which case evidence of

authority to sell is only required if it impacts the enforceability of the PSA against the

Seller.  Since, according to AFTC, the lack of HAP approval would not limit GFI's

ability to enforce the PSA, then failure to deliver this approval at the closing would not

be considered a breach of contract.  AFTC asserts further that there is no evidence that

that lack of HAP approval is what caused GFI to not fulfill its obligations at the closing

date.  According to AFTC, "[t]he Seller cannot be found to have breached a contract in

the absence of causation and damages." Reply at p. 16.

 While GFI might be correct in its assertion that AFTC had a duty to deliver HAP

approval for the sale under the terms of the PSA, GFI's failure to comply with its

obligation under Section 9 of the PSA to provide notice of default would in turn preclude

its ability to assert a breach of contract claim against AFTC.  Section 9 states that without

notice of default and the allowance for a 5-day cure period there can be no declaration of

default.  Since GFI does not contest the fact that the required notice of default was never

provided to AFTC, their claim of breach regarding AFTC's failure to receive HAP

approval for the sale is without merit.

### D.  *Fraud in the Inducement*

 In the complaint, GFI alleges that the Defendant committed fraud in the

inducement by making a number of misrepresentations regarding the ability to assume

the loans and by not properly disclosing several terms restricting the loans.  GFI

specifically claims that the representations made by AFTC with respect to the loans'

"financial obligations, more specifically the reserve requirements and repair obligations,

were false, and in addition, that two of the loans could not even be satisfied in advance of

the closing as it was still in the lock-up period." *See* Comp. ¶115. GFI further claims

that these false statements were made in order to induce GFI to enter into the PSA and it

was on these representations that GFI reasonably relied upon in deciding to enter into the

agreement.

a. *Loan Terms*

    1. *GFI's Knowledge of Lockout Provisions*

       GFI alleges in its complaint that the Defendant committed fraud in the

inducement by not disclosing the fact that two of the loans could not be paid off at the

time of the closing due to lockout restrictions. In the Opposition, GFI expounds on this

claim in arguing that it did not have adequate knowledge of the existence of the lockout

provisions encumbering the loans. GFI contends that the information it received

regarding the terms of the mortgage would only be considered constructive notice, which

does not necessarily absolve a seller from liability for fraud in the inducement.[9] *M/T*

*Schottenstein v. Azam* 813 So.2d 91, 94 (Fla. 2002) (noting that the "question of whether

a cause of action for fraudulent misrepresentation exists where the putatively

misrepresented information is contained in the public record is one of fact.").

       The Defendant cites several arguments in support of its position that GFI has no

legal basis for making a fraud in the inducement claim regarding the lockout provisions.

First, AFTC argues that GFI did have knowledge of the lockout restrictions on the loans

prior to executing the First Amendment to the PSA. AFTC supports its assertion by

referencing the deposition of Gross in which he states that at the time that the First

Amendment was executed by GFI, the company had knowledge of the lockout provisions

---

[9] AFTC provided GFI with the mortgage notes through email on April 25, 2007. These documents
included details of the lockout provisions. *See* Defendant's Motion for Summary Judgment, Exhibit B.

and yet was still intent on closing the transaction.  Gross Dep. at p. 149-150.  AFTC

contends that GFI's prior knowledge of the loan terms would preclude their ability to

bring a fraud in the inducement claim, as the court in *M/T Schottenstein* holds that a

buyer's knowledge of a given fact in turn bars it from being able to bring a fraud claim

based on a misrepresentation which contradicts such knowledge.  *Id*.; *see also Schopler v.*

*Smilovits,* 689 So.2d 1189 (Fla. 4th DCA 1997) (holding that a party's full knowledge of

the given circumstances would negate its ability to make a valid fraud claim).  According

to AFTC, GFI is wrong in assuming that the case here involved constructive notice, as

seen from the fact that Gross explicitly acknowledges that GFI had prior knowledge of

the loans.  Furthermore, AFTC argues that the emails, included in Defendant's Motion

for Summary Judgment Exhibit B, which included full disclosure of the lockout terms,

clearly demonstrate that GFI had full knowledge of these provisions prior to executing

the PSA.

	Based on the fact that that the Buyer, GFI, did have prior knowledge of the

lockout provisions, GFI is unable to assert a valid fraud in the inducement claim.  GFI's

actual knowledge of the provision undercuts its ability to demonstrate actual reliance on

the Defendant's alleged misrepresentations, which is necessary in order to make a claim

of fraudulent misrepresentation.  *See M/T Schottenstein*, 813 So.2d at 95 (noting that

there is no claim for fraudulent misrepresentation when the plaintiff has knowledge that

the representation is false).  *See also White Construction Co. v. Martin Marietta*

*Materials Inc.*, 633 F.Supp.2d 1302, 1325 (M.D. Fla. 2009).

	As discussed above, it is clear from the record that GFI had full knowledge of the

lockout provisions.  This is seen most clearly from the fact that the Plaintiffs, in their

Statement of Disputed Facts to Defendant's Motion for Summary Judgment Section 19, explicitly acknowledge that they had prior knowledge of the lockout provisions and their claim is simply that Section 11 of the PSA constituted an express statement by AFTC that the lockout terms could be renegotiated.  Moreover, Gross states in his deposition that at the time that the First Amendment was executed by GFI, the company had knowledge of the lockout provisions and yet was still intent on closing the transaction. Gross Dep. at pp. 149-150.

The fact that GFI had prior knowledge of the lockout terms would in turn completely undercut its argument that they had only received constructive notice of the terms through emails containing the mortgage notes.  While the court in *M/T Schottenstein* does recognize the fact that constructive notice of a fraud does not preclude a plaintiff from making a claim of fraudulent representation, it stipulates further that actual knowledge of a fraud would prevent a party from asserting a fraud claim.  813 So.2d 91 at 94-95.   Since in the given circumstances GFI possessed actual knowledge of the alleged fraud, GFI is precluded from asserting a fraud claim against the Defendant. *See Schopler*, 689 So.2d 1189 (Fla. 4th DCA 1997) (holding that a party's full knowledge of the given circumstances would negate its ability to make a valid fraud claim).

2.  *Cornfeld's Oral Representations Regarding the Loan Terms*

The Plaintiffs further argue in the Opposition that even if they did have adequate knowledge of the lockout provisions, Cornfeld of AFTC had made oral representations of his ability to renegotiate around these terms.  GFI contends that Cornfeld's misleading representations regarding his ability to circumvent the lockout restrictions amount to

fraud in the inducement, as GFI reasonably relied on the accuracy of these statements in deciding to enter into the PSA.

The Defendant argues further that regardless of whether or not Cornfeld made oral representations to GFI regarding his ability to renegotiate the loans' lockout terms, the express terms of the PSA would still preclude GFI from making a fraud in the inducement claim on such grounds. Section 22 of the PSA states that the Seller's representations are limited to those explicitly mentioned in the PSA, and therefore AFTC argues that that any oral statements would not be classified as representations. AFTC emphasizes the court's ruling in *Bates v. Rosique* which held "having executed a contract which plainly and unambiguously asserts that there are no other agreements or representations other than those contained in that contract, the [Buyers] cannot now take a contradictory position." *777* So.2d 980, 982 (Fla. 3d DCA 2001); *accord Garcia v. Santa Monica Resort, Inc.*, 528 F. Supp. 2d 1283, 1295 (S.D. Fla. 2007).

Regardless of any oral or written representations that AFTC may have made with respect to its ability to circumvent the lockout provisions, it is clear that GFI would be precluded from asserting a fraud in the inducement claim. First, Section 22 plainly states that the Seller's representations are limited to those expressly mentioned in the PSA, and as a result any oral representations made by Cornfeld would not carry any legal weight. *See Rosique*, *777* So.2d at 982; *accord Garcia v. Santa Monica Resort, Inc.* 528 F. Supp. 2d 1283, 1295 (S.D. Fla. 2007). Since the PSA makes no mention of a representation by AFTC that the terms of the loan can be renegotiated, GFI cannot prevail on a fraud claim relating to this supposed representation.

3. *Section 11 as an Express Statement*

In an effort to assert a fraud claim that would attach to an actual representation included in the PSA, GFI makes the argument that Section 11, which includes the provision allowing GFI to direct AFTC to pay off the loan prior to the closing date, is an express statement by AFTC that the loans are not restricted by any lockout provisions. GFI argues that by agreeing to pay off the loans prior to the closing date at GFI's discretion, AFTC is expressly stating that there are no lockout provisions that would prevent the borrower from immediately paying off the loans. The Plaintiffs reject the notion that the execution of the First Amendment could be considered a ratification of the terms of the original PSA, since they argue that the First Amendment was largely a ministerial document, which in turn could not serve as an adequate ratification of the PSA.

AFTC also challenges GFI's assertion that Section 11 of the PSA, which includes the provision allowing GFI to direct AFTC to pay off the loan prior to the closing date, is an express representation that could serve as a basis for a fraud in the inducement claim. AFTC maintains that even if Section 11 was understood to contain an express representation that there were no lockout provisions restricting the loans, GFI ratified the PSA through signing the First Amendment and waived any potential right to make a fraud in the inducement claim. AFTC relies on the court's ruling in *Zurstrassen v. Stonier*, which held that a party forfeits the right to make a claim of fraud when it takes action, such as executing a ratifying document, that expresses acceptance of the fraud. 786 So.2d 65, 71 (Fla. 4th DCA 2001).

25

GFI's argument that the Defendant committed fraud in the inducement by making an express representation in Section 11 of the PSA that there are no lockout provisions in the loans is also without merit. Regardless of whether or not the Defendant's commitment to pay back the loans prior to the closing constituted an express representation that there are no lockout restrictions, GFI, through executing the First Amendment, ratified all the terms of the PSA and waived any potential right to make a fraud in the inducement claim. As mentioned above, it has been established that "if a party knows of a fraud, does not reject it, and takes any material act inconsistent with an intent to avoid or delays in asserting any remedial rights, then that party ratifies the fraud." *Zurstrassen*, 786 So.2d at 71. Therefore, even if Section 11 is understood to contain an express representation by the Seller that there is no lockout provision in the loan, GFI relinquished any right to make a fraud in the inducement claim after signing the Amendment. Moreover, GFI's portrayal of the Amendment as being a purely ministerial document that would not be able waive their right to bring a fraud claim is without merit, as Section 4 of the Amendment explicitly states that all provisions mentioned in the PSA that do not contradict the terms of the Amendment would remain in effect. *See Bisset v. Ply-Gem Industries, Inc.,* 533 F.2d 142 (5th Cir. 1976) (holding under Florida law that waiver exists "when the allegedly defrauded party has entered into a new agreement respecting the subject matter of the prior alleged fraudulent transaction . . . and the later agreement was made with actual or imputed knowledge of the facts constituting the alleged fraud."); *accord Coral Gables Imported Motorcars v. Fiat Motors of North America,* 673 F.2d 1234, 1240 (11th Cir. 1982).

GFI's ratification of the PSA's loan terms would also prevent it from bringing its claim regarding the other alleged fraudulent misrepresentations mentioned in the complaint.  Beyond the lockout provisions, GFI also claims that AFTC misrepresented the reserve requirements and repair obligations with respect to the loans.  While the arguments and evidence presented by both parties focuses mainly on the lockout provisions as opposed to the reserve requirements and repair obligations, it is clear that GFI would not be able to assert a fraud claim regardless of whether or not AFTC misrepresented these terms.  Again, through executing the First Amendment GFI ratified the terms of the PSA, including Section 22 which stipulates that there can be no representations aside from those mentioned in the agreement.

b.  *Economic Loss Rule*

Finally, in its Motion at pp. 9-11, AFTC argues that in the event that it is determined that the Plaintiffs did not have knowledge of the lockout provisions prior to entering the PSA, the Court should still find that the Plaintiffs' fraud in the inducement claim is barred due to the Economic Loss Rule.  The Economic Loss Rule prevents a party from asserting a fraud in the inducement claim if it does not involve a tort independent from that of a breach of contract claim.  *See Rosique,* 777 So.2d 980, 982 (Fla. 3d DCA 2001).  AFTC contends that the Economic Loss Rule would bar GFI's claim since the PSA clearly states in Section 22 that the Defendant's representations are limited to those explicitly mentioned in the agreement, which in turn makes the claim for relief here through tort identical to that for breach of contract.  *See Mac-Gray Services v. DeGeorge,* 913 So.2d 630, 634 (Fla. 4th DCA 2005) (holding that a party cannot recover

in fraud for alleged misrepresentations that are adequately covered or expressly

contradicted in a later written contract).

Moreover, AFTC asserts that the Economic Loss Rule would apply here even

though "Plaintiffs seek no more than the Purchase and Sale Agreement allows in terms of

liquidated damages, the economic loss rule is inapplicable." Opposition at p. 19.  AFTC

argues that the Economic Loss Rule would apply specifically because GFI is requesting

the identical relief in tort as it seeks for breach of contract, as the rule is intended to

prevent a party from using a claim in tort in order to sidestep the inability to bring the

identical claim for relief due to breach of contract.  *Ginsberg v. Lennar Fla. Holdings,*

*Inc.*, 645 So.2d 490, 494 (Fla. 3d DCA 1994).

 GFI, however, contends that the Economic Loss Rule should not bar its fraud in

the inducement claim against AFTC.  GFI argues that since the Economic Loss Rule only

applies when the claim being made is independent from that of a breach of contract

claim, it therefore should not apply in this instance, since its fraud in the inducement

claim is completely unrelated to any potential breach of contract claim with respect to the

PSA.  *See Output, Inc. v. Danka Business Systems, Inc.*, 991 So.2d 941, 944 (Fla. 4th

DCA 2008).  In addition, GFI presumes that even if the Economic Loss Rule would apply

in this case, it would still be able to claim the contractual remedies allowed through the

PSA.  They argue that since they are not seeking damages beyond those stipulated in the

PSA, the Economic Loss Rule would not bar such a claim.

While GFI's fraud in the inducement claim would be precluded for the reasons

discussed above, the Economic Loss Rule is yet another reason why GFI would be barred

from asserting such a claim.  As stated previously, the Economic Loss Rule prevents a

party from making a fraud in the inducement claim that does not involve a tort

independent from that of a breach of contract claim.  *See Rosique,* 777 So.2d at 982 (Fla.

3d DCA 2001).  In this instance, the claim relating to misrepresentations of the loan

terms is not independent from a breach of contract claim, as Section 22 limits the

representations to those included in the agreement.  Meaning, any valid claim regarding

an alleged misrepresentation would relate to the representations established in the

contract, and hence would be classified as a breach of contract claim.  GFI's reliance on

the court's ruling in *Output, Inc. v. Danka Business Systems, Inc.* in order to support its

position that the claim of fraudulent misrepresentations would be independent from

breach of contract is completely misplaced.  In fact, the court there makes clear that when

a contradictory representation is included in a subsequent contract to which the plaintiff

is a party, then the Economic Loss Rule would apply to bar a fraud claim.  *Id.*, 991 So.2d

at 944.  For all of the above reasons it is apparent that the Economic Loss Rule would

apply in this instance.  *See Rosique,* 777 So.2d at 982 (noting "where the alleged

fraudulent misrepresentations are inseparably embodied in the parties' subsequent

agreement, the Economic Loss Rule will apply.").

Moreover, GFI wrongly assumes that even if the Economic Loss Rule were to

apply, it would still be able to claim the contractual remedies allowed through the PSA.

This assertion is incorrect, since the court in *Ginsberg v. Lennar Fla. Holdings, Inc.*

makes clear that Economic Loss Rule is intended to prevent a party from using a claim in

tort in order to sidestep the inability to bring the identical claim for relief through a

breach of contract claim.  645 So.2d 490, 494 (Fla. 3d DCA 1994).  The Economic Loss

Rule would bar the Plaintiffs' claims since here it is in fact using a tort claim "to circumvent the contractual relationship by bringing the action in tort." *Id.*

### E. *Conclusion*

The Defendant has met its burden under Fed. R. Bankr. P. 7056, in demonstrating that there is no genuine issue as to any material fact with respect to the claims set forth by the Plaintiff. For the reasons set forth above, the Defendant's motion for summary judgment is granted on both the breach of contract and fraud in the inducement claims.

Counsel for the Defendant is to settle an order consistent with this opinion.

Dated: New York, New York
        July 8, 2010

                    **s/Arthur J. Gonzalez**
                    CHIEF UNITED STATES BANKRUPTCY JUDGE